Gary VICKERY, Plaintiff,

v.

Genelle JONES, William Peerman, William Roberts, the Saline County Republican Central Committee and Kirk Brown, Defendants.

No. 93–CV–4030–JLF.

United States District Court,
S.D. Illinois,
Benton Division.

July 6, 1994.

Mary L. Leahy, Leahy Law Offices, Springfield, IL, for plaintiff.

Charles R. Schmadeke, Asst. Atty. Gen., Springfield, IL, Jeffrey D. Colman, Edward J. Lewis, II, Katherine J. Dickinson, Melissa S. Widen, Jenner & Block, Chicago, IL, Craig S. Burkhardt, Peggy J. Ryan, Sorling, Northrup, Springfield, IL, for defendants.

## MEMORANDUM AND ORDER

FOREMAN, District Judge:

This matter is before the Court on the following motions: a motion to dismiss by defendants William Roberts and the Saline County Republican Central Committee (Doc. 22); a motion to dismiss by state officials Genelle Jones, William Peerman [1], and Kirk Brown (Doc. 27); plaintiff's motion to strike the state officials' supplemental response (Doc. 73); plaintiff's motions to amend the complaint (Docs. 51 and 54); plaintiff's Motion to Certify Action as Class Action (Doc. 21); and the State Officials' Motion to Dismiss Plaintiff's Class Allegations (Doc. 29).

The plaintiff, Gary Vickery, brought this action against certain state officials and members of the Republican party, alleging that the defendants maintain and operate a political patronage system in which political and financial supporters of the Republican Party of the State of Illinois are favored in regard to state employment as highway maintainers. The plaintiff asks the Court to declare the system illegal and unconstitutional and to enjoin its operation. The plaintiff also seeks compensatory and punitive damages for persons who have suffered injury as a proximate cause of the defendants' conduct. The action was filed pursuant to 42 U.S.C. §§ 1983 and 1988 and, therefore, the Court has jurisdiction under 28 U.S.C. § 1343.

## BACKGROUND

In September 1991, Vickery and the Illinois Department of Transportation entered into a contract whereby plaintiff would work under a six-month contract as a highway maintainer. Plaintiff had taken the highway maintainer exam and received an "A" grade. For the next six months he performed his duties in an acceptable manner. However, in April 1992, at the expiration of his contract, Gene Bethel was awarded the six-month contract instead of Vickery. Bethel is now working under a second six-month contract. Plaintiff maintains that he was and is more qualified for the position than Bethel.

Vickery alleges that the defendants acted under color of law in maintaining and operating a political patronage system in Illinois that denied him a second six-month contract. He asserts that state officials Genelle Jones, William Peerman, and Kirk Brown were motivated by political considerations such as whether the individual was a Republican, was sponsored by an influential Republican, or was a financial or other supporter of the Republican Party. The plaintiff asserts that Jones was employed in the governor's office and told the Illinois Department of Transportation (IDOT) who should be awarded the contracts. Brown was Secretary of IDOT and Peerman worked in IDOT's personnel department.

The complaint alleges that in making these employment decisions, the state officials took advice from defendant Roberts, who was chairman of the Saline County Republican Central Committee, and other Republican Party officials in Illinois. The complaint further alleges that Roberts considered the individual's voting record and support of the Republican Party, and that the Saline County Republican Central Committee and its counterparts in other counties screened employees based on the individual's voting record, support, and potential future support of the Republican Party. As a result, the plaintiff alleges that the state officials favored those persons supported by the Republican Party when approving the six-month contracts for highway maintainer, possibly hundreds of times over the last two years.

The plaintiff claims that his duties as a temporary highway maintainer were the same as the duties for a permanent highway maintainer as established under the Illinois Personnel Code, 20 Ill.Comp.Stat. 415/1 to 415/19c.1 (1993). The plaintiff alleges that there is no provision in the Personnel Code that would allow the duties of a permanent civil service position to be performed under successive six-month contracts. He alleges that the temporary positions are used to avoid hiring permanent employees. Thus, he contends that the use of the six-month contracts is designed to circumvent the prohibi-

---

1. The Court notes that there is a question as to the correct spelling of the names of defendants Jones and Peerman. The Court will use the spelling contained in the complaint.

tion against political patronage hirings in *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990).

Plaintiff seeks to represent both classes of highway maintainers—i.e., (1) all persons denied the position of highway maintainer for periods of six months due to their political affiliation or non-affiliation or their lack of support by the Republican Party; and (2) all persons denied the permanent position of highway maintainer due to their political affiliation or non-affiliation or their lack of support by the Republican Party.

In Count I of his first amended complaint, the plaintiff contends that he was denied a second six-month contract as highway maintainer because of the defendant's patronage system. This count, which involves only the class of individuals denied the six-month positions, alleges that the denial of this position due to political affiliation or non-affiliation violates the putative class members' rights as protected by the First and Fourteenth Amendments. Count II prays this Court to declare the awarding of the six-month contracts a subversion of the position of permanent highway maintainer and, therefore, involves only the class of persons denied the permanent positions.

## DISCUSSION

The state officials and the Republican Party officials have filed separate motions to dismiss the claims against them. The Court also must address the plaintiff's motion to certify the action as a class action, the plaintiff's motion to strike the state officials' supplemental response, and the plaintiff's two motions to amend the complaint.

### I. Claims Against the Republican Party Defendants

 Defendants Roberts and the Saline County Republican Central Committee move this Court to dismiss Counts I and II pursuant to Rule 12 of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. For purposes of the defendants' motion, all well-pleaded allegations of the complaint must be taken as true. *Wolfolk v. Rivera,* 729 F.2d 1114, 1116 (7th Cir.1984). The test to be applied on a

motion to dismiss is whether "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). A plaintiff need not set out in detail the facts upon which a claim is based, but must allege sufficient facts to outline the cause of action. *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985).

 The plaintiff's civil rights claim is based upon *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), in which the Supreme Court held that state officials cannot make certain employment decisions based upon the employee or job applicant's political affiliation or support. The party defendants acknowledge that under *Rutan,* state officials cannot use political information in connection with employment decisions for public employees. However, the defendants argue that the Court's holding does not prohibit the gathering of information by a political organization, such as voting records or financial contributions, or the transfer of that information. The Court agrees.

Nothing in the *Rutan* decision suggests that it is unconstitutional for political parties to disseminate political information or make recommendations based upon political affiliation or support. In fact, the Supreme Court has held that the use of political affiliation information is acceptable for some government positions, policymaking or otherwise. *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *see also Elrod v. Burns,* 427 U.S. 347, 372, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (plurality opinion) ("Our decision ... does not outlaw political parties or political campaigning and management. Parties are free to exist and their concomitant activities are free to continue."). Thus, if political information can properly be considered by state officials in certain circumstances, obviously the political parties may collect and disseminate such information.

 Moreover, the party defendants argue that their First Amendment rights would be infringed if they were prohibited from engag-

ing in such activities. It is without question that political parties are afforded the protection of the Constitution. *See N.A.A.C.P. v. Alabama ex rel. Patterson,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958) (affirming an association's right "to engage in association for the advancement of beliefs and ideas."). This protection includes freedom of speech and association. "Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association." *N.A.A.C.P. v. Button,* 371 U.S. 415, 431, 83 S.Ct. 328, 337, 9 L.Ed.2d 405 (1963) (citing *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957) (plurality opinion)).

■ The First Amendment protects not only the right to speak one's mind on political issues, but also "the right to engage in 'vigorous advocacy'...." *Buckley v. Valeo,* 424 U.S. 1, 48, 96 S.Ct. 612, 648, 46 L.Ed.2d 659 (1976). "Advocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy or the passage or defeat of legislation." *Id.*

In this case, the political party is advocating that a particular person should be hired, as opposed to elected, for a government position. However, the fact remains that the political party is expressing its views on a governmental matter and, therefore, is engaged in political expression. Accordingly, the Court concludes that it is not unconstitutional for a political party to compile information, make it available to state officials or advocate that the state hire a particular individual. What *Rutan* prohibits is the *use* of that political information by the state hiring authority.

■ It is clear that the party defendants did not make the actual employment decisions for the highway maintainer positions. The plaintiff's complaint expressly alleges that IDOT officials Brown and Peerman had the legal authority to approve or disapprove the employment contracts. This same paragraph of the complaint goes on to allege that Peerman and Brown had "cooperated with the patronage system by ... delegating to

Jones, Roberts, and the Saline County Republican Central Committee and other officials the decisions for the six-month contracts for highway maintainer." However, it is obvious from reading the complaint as a whole that neither Roberts nor the committee had the power to approve the contract or that they actually hired applicants.

In his brief opposing the motion to dismiss, the plaintiff asserts that "those persons whom the Party Defendants (Roberts and the Committee) named got the jobs." Plaintiff's Response to the Motion to Dismiss at 3. But all this alleges is that Roberts and the Committee recommended people for the positions. Plaintiff continually claims that these defendants "decided" who would fill the position, but it is never alleged that they actually hired applicants. To the contrary, the complaint alleges that the result of the patronage system is that *"Jones, Peerman, and Brown* favored those persons who are supported by the Republican Party when those Defendants approved six-month contracts for the position of highway maintainer." Amended Complaint ¶ 23 (emphasis added). Thus, the plaintiff has not alleged that the state officials "delegated" responsibility to the party defendants in the sense that there was a formal transfer of authority. Rather, the Court construes the complaint to allege only that the state officials in essence "rubberstamped" the party's recommendations.

Simply making a recommendation as to who should be hired for a particular position does not make out a violation of *Rutan.* Thus, the party defendants cannot be held liable for the constitutional violations alleged under Count I with respect to the persons who were denied temporary highway maintainer positions. Likewise, the plaintiff's failure to allege that the party defendants had actual hiring authority is also fatal to any claim against these defendants in Count II, which seeks a declaration that the awarding of six-month employment contracts violates and subverts the provisions of the Illinois Personnel Code.

The Court, therefore, finds that the plaintiff has failed to state a claim for which relief can be granted against the party defen-

dants.[2] Accordingly, the Court hereby **GRANTS** the motion to dismiss Counts I and II against defendants Roberts and the Saline County Republican Central Committee. The Court notes that this dismissal is **WITHOUT PREJUDICE;** thus, to the extent that the plaintiff intended to allege that the party defendants had actual hiring authority, the plaintiff may seek leave to amend the complaint accordingly.

In one of his pending motions to amend, the plaintiff seeks leave to add various other Republican Party officials as defendants, such as the Republican Party of the State of Illinois, state party chairman Harold Smith, and other Republican Party county organizations and their officials. The Court notes, however, that the proposed amendment raises essentially the same claims that the Court is dismissing against Roberts and the Saline County Republican Committee. Based upon the Court's decision that these allegations do not state a claim that would entitle the plaintiff to relief, the Court hereby DENIES plaintiff's second Motion to Amend the Complaint (Doc. 54).

## II. Claims Against the State Officials

The state officials move this Court to dismiss the amended complaint for failure to state a claim on the grounds that *Rutan* does not apply to temporary employees such as plaintiff Vickery. In the alternative, they move to dismiss the damage claims against them under the doctrine of qualified immunity.

### A. Motion to Dismiss.

The state officials contend that *Rutan's* protection does not extend to temporary employees because the rationale for the decision makes it clear that the Supreme Court meant to limit its holding to permanent, or career, employees. The defendants also argue that temporary employees are more analogous to independent contractors who, under Seventh Circuit authority, may be hired or fired for political reasons. The Court finds these arguments unpersuasive.

■ As a preliminary matter, the Court notes that the state officials have filed a supplemental response in support of their motion to dismiss. The plaintiff has filed a motion to strike the supplemental response. Under Rule 15(d) of the Federal Rules of Civil Procedure a party may file supplemental pleadings upon leave of court. Defendants have not made a motion to file the supplemental response. Therefore, plaintiff's motion to strike (Doc. 73) is **GRANTED** and the defendants' supplemental response is hereby **STRICKEN.**

■ The Supreme Court's political patronage decisions have evolved through three landmark cases decided over a span of fourteen years. The first two cases dealt with the constitutionality of discharging or threatening to discharge employees solely for not supporting the political party in power. *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In *Elrod,* non-civil service employees of the Cook County sheriff's office brought a class action alleging that they were fired or threatened with dismissal for the sole reason that they were not affiliated with or sponsored by the political party in power. The Court held that the practice of patronage dismissals infringes upon an individual's political beliefs and association, which "constitute the core of those activities protected" by the First and Fourteenth Amendments. 427 U.S. at 356, 96 S.Ct. at 2681 (plurality opinion).[3] Therefore, restraints upon these inter-

---

**2.** Defendant Jones has not moved for dismissal on this ground and, therefore, the Court expresses no opinion at this time as to whether this analysis also applies to the claims against her.

**3.** The plurality opinion, which was written by Justice Brennan and joined by Justices White and Marshall, found that patronage dismissals would inevitably tend to coerce employees into compromising their true political beliefs. Thus, the practice fell within a line of Supreme Court precedents condemning the use of governmental power to prescribe what the citizenry must accept as orthodox opinion. *See Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). The plurality also relied upon the rule in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), which prohibits imposing an unconstitutional condition on the receipt of a public benefit. The concurring opinion, which was written by Justice Stewart and joined by Justice Blackmun, cited only to

ests are permitted only if such restraints "further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." *Id.* at 363, 96 S.Ct. at 2685.

In *Branti,* two assistant public defenders employed by the county brought a civil rights action alleging that they were about to be dismissed solely because of political affiliation. The Supreme Court reaffirmed its prior decision that "the First Amendment prohibits the dismissal of a public employee solely because of his private political beliefs." 445 U.S. at 517, 100 S.Ct. at 1294. The Court, therefore, held that dismissed employees were not required to prove that they had capitulated to political coercion (e.g., that they had changed their political party or worked for the party's candidates); rather, it was sufficient to prove that they had been discharged "solely for the reason that they were not affiliated with or sponsored by the Democratic party." *Id.* at 516–17, 100 S.Ct. at 1294.

Both *Elrod* and *Branti* recognized an exception to this general rule—i.e., they stated that "party affiliation may be an acceptable requirement for some type of government employment." *Branti,* 445 U.S. at 517, 100 S.Ct. at 1294. In *Elrod,* the plurality and concurring opinions suggested that patronage dismissals might be appropriate in cases involving policymaking positions. 427 U.S. at 367, 96 S.Ct. at 2686 (plurality opinion); *id.* at 374–75, 96 S.Ct. at 2690–91 (Stewart, J., concurring). The *Branti* decision clarified this exception, stating "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295.

The *Rutan* decision extended the *Elrod* and *Branti* prohibition to other types of employment decisions. In *Rutan,* the governor of Illinois had issued an executive order that prohibited state officials from hiring any em-

the *Perry* decision. 427 U.S. at 374–75, 96 S.Ct.

ployee, filling any vacancy, creating any new position, or taking any similar action without the governor's permission. The plaintiffs brought suit to challenge the governor's use of political considerations in giving his permission for these hiring, transferring, promoting, and rehiring decisions. The Supreme Court held that the *Elrod–Branti* analysis was equally applicable to this type of political patronage. More specifically, the Court rejected the argument that these types of decisions were not punitive in nature and, therefore, do not chill the exercise of protected belief and association by public employees.

With respect to transfers, promotions and recalls, the Court stated:

> Employees who do not compromise their beliefs stand to lose the considerable increases in pay and job satisfaction attendant to promotions, the hours and maintenance expenses that are consumed by long daily commutes, and even their jobs if they are not rehired after a "temporary" layoff. These are significant penalties and are imposed for the exercise of rights guaranteed by the First Amendment. Unless these patronage practices are narrowly tailored to vital government interests, we must conclude that they impermissibly encroach on First Amendment freedoms.

497 U.S. at 74, 110 S.Ct. at 2736. The Court further stated that patronage hirings place similar burdens on First Amendment rights by denying access to a state job in the first place.

 Today, this Court decides a question that was not expressly addressed in the *Elrod–Branti–Rutan* trilogy—i.e., whether the political patronage rules apply to temporary as well as permanent employees. Based upon the Supreme Court's analysis in the prior cases, the question must be answered in the affirmative.

First, and foremost, the Court notes that the Supreme Court has repeatedly rejected the argument that there is no right or entitlement to public employment and, therefore, political patronage does not infringe upon the

at 2690–91.

employees' First Amendment rights. "[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely." *Id.* 427 U.S. at 360–61, 96 S.Ct. at 2683 (quoting *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972)). Thus, the Court has long recognized that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry,* 408 U.S. at 597, 92 S.Ct. at 2697.

Under this analysis, an applicant for a temporary position is indistinguishable from an applicant for a permanent position. Both are seeking a state paycheck and other benefits, if any, that may be provided by the state. The temporary nature of the job may affect the size and number of benefits provided to the successful applicant and the length of time in which they are available. However, that does not detract from the fact that the applicant is being denied a state job for however long it may last and for whatever remuneration is available. In fact, the plaintiff in *Perry* could be considered a temporary employee because he was employed under a one-year contract and had filed suit because of his employer's refusal to renew the contract for another year. 408 U.S. at 594, 92 S.Ct. at 2696. Thus, the Court concludes that the rule set forth in *Perry* and adopted for patronage cases in *Elrod, Branti,* and *Rutan* was intended to apply to temporary employees.

Secondly, although the Supreme Court did not expressly state that its decisions applied to temporary employees as well as permanent employees, the Court's rationale for the *Elrod–Branti–Rutan* prohibition has equal force in both settings. "Under our sustained precedent, conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so." *Rutan,* 497 U.S. at 78, 110 S.Ct. at 2739. Applicants for temporary positions have the same First Amendment rights to their personal political beliefs and associations as do applicants for permanent positions. Accordingly, regardless of whether a particular job is temporary or permanent, the government must demonstrate (1) a vital governmental interest that would be furthered by its political hiring practices; and (2) that the patronage practices are narrowly tailored to achieve that governmental interest.

The Supreme Court has discussed several proposed governmental interests in the *Elrod–Branti–Rutan* trilogy. However, the Court's decisions have made no distinction between temporary and permanent employees, and the defendants have not presented any principled reason for recognizing such a distinction. For example, the Court recognized that the government has an interest in securing effective employees. *Rutan,* 497 U.S. at 74, 110 S.Ct. at 2737. But the Court held that this interest can be met by discharging, demoting, or transferring employees whose work is deficient. *Id.* Similarly, the "government's interest in securing employees who will loyally implement its policies can be adequately served by choosing or dismissing certain high-level employees on the basis of their political views." *Id.* This analysis is equally applicable to employees hired on a temporary basis as well as on a permanent basis.

The Supreme Court also recognized that the government has an interest in preserving the democratic process. However, the Court stated that political patronage is not the least restrictive means of achieving this end. *Id.; Elrod,* 427 U.S. at 368–69, 96 S.Ct. at 2687–88. Again, this analysis does not change when applied to temporary positions as opposed to permanent jobs.

■ The Court recognizes that some types of jobs may be subject to political patronage. However, in order to qualify for this exception, the hiring authority must demonstrate "that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295. The defendants have not done so in the case at bar. To the contrary, the plaintiffs assert that the State of Illinois itself has classified

the job of permanent highway maintainer as a position that does not qualify for this exception. This Court can find no vital governmental interest in requiring *temporary* workers to be affiliated with the party in power when the government acknowledges that it does not have such a vital interest with respect to employees hired for the same position on a *permanent* basis.

The Court further notes that several First Circuit decisions that pre-dated *Rutan* found "no practical difference" between permanent and career employees for First Amendment purposes. *See, e.g., Cheveras Pacheco v. Rivera Gonzalez,* 809 F.2d 125, 127–28 (1st Cir.1987). That court stated that *Elrod* and *Branti* clearly apply to an employee's right to retain his public employment and that there is no difference between employees discharged from permanent employment and those who fail to receive a new appointment. *Id.*[4] "Any other result would seriously undermine *Elrod* and *Branti* because local governments could pass laws providing that the jobs of nonpolicymaking employees extend only from election to election, and that the new officeholder is entitled to make all new appointments." *Id.* at 128. That is exactly what the plaintiff has accused the defendants of doing in the case at bar.

Additionally, the Court notes that the First Circuit has extended the *Elrod–Branti* rule to persons employed under contract. The court in *Cordero v. De Jesus–Mendez,* 867 F.2d 1, 21 (1st Cir.1989), stated that "contract employees [may not] be discharged in violation of their first amendment right to free political speech and association." The court reiterated that the lack of an expectation of continued employment does not justify dismissal based on private political beliefs. *Id.*

The defendants also assert that temporary employees are analogous to independent contractors who may be hired or fired for political reasons.[5] The Seventh Circuit has declined to extend the *Elrod–Branti* decisions to independent contractors. *LaFalce v. Houston,* 712 F.2d 292 (7th Cir.1983). In *Triad Associates, Inc. v. Chicago Housing Authority,* 892 F.2d 583, 587 (7th Cir.1989), the court refused to reconsider *LaFalce* and reaffirmed that the *Elrod–Branti* prohibition against discharge of public employees for partisan reasons does not apply to independent contractors. More recently, the Seventh Circuit again declined to overturn *LaFalce* and reiterated that "political favoritism in the awarding of public contracts is not actionable." *Downtown Auto Parks, Inc. v. City of Milwaukee,* 938 F.2d 705, 710 (7th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 640, 116 L.Ed.2d 657 (1991).

 Thus, it is undisputed that independent contractors may be hired or fired for political reasons. The issue is whether temporary employees are analogous to independent contractors so that they too may be hired or fired for political reasons. The Court finds they are not analogous.

The *LaFalce* court noted that the basis of the *Elrod–Branti* prohibition against patronage "is that public employees would be discouraged from expressing their true political views if it might cost them their jobs." 712 F.2d at 293. Rejecting the argument that independent contractors will be similarly discouraged, the court stated:

> If the contractor does not get the particular government contract on which he bids, because he is on the outs with the incumbent ... it is not the end of the world for him; there are other government entities

---

4. This holding was advanced by *Figueroa v. Aponte–Roque,* 864 F.2d 947 (1st Cir.1989). The court stated that transitory employees are protected from politically motivated nonrenewals regardless of how many terms the transitory employee had served. "Although a long-tenured 'temporary' employee 'particularly' enjoys the protection described in *Elrod* and *Branti,* a one-term employee also is protected from political discharge." *Id.* at 951 n. 7.

5. The Court notes that there is no dispute over the fact that the positions at issue in this case are filled by temporary employees and not independent contractors. The state defendants assert that the nature and scope of temporary employment "distinguishes temporary employees like plaintiff" from permanent employees. State Official's Response to Plaintiff's Motion to Cite Additional Authority at 2. Thus, they concede that the work at issue here does not involve independent contractors.

to bid to, and private ones as well. It is not like losing your job.

*Id.* at 294. When an independent contractor loses a contract, the contractor presumably still has other business. Each contract generally represents only a portion of the contractor's work and the loss of one contract does not put the contractor out of work entirely. However, a temporary job is usually an individual's sole source of employment. Just as the loss of a permanent job puts the permanent employee out of work entirely, the loss of a temporary job also puts the temporary employee out of work entirely.

Although the *LaFalce* court stated that unless the government worker cannot find another job the "loss will not be a total catastrophe," it did recognize that government jobs are generally more lucrative than private sector jobs. *Id.* The court stated:

> [M]any government workers could not find employment at the same wage in the private sector; and the prospect that a protracted period of search following discharge might well result in a substantially less well paid job would cause many government workers to flinch from taking political stands adverse to their superiors. An independent contractor would tend we imagine to feel a somewhat lesser sense of dependency.

*Id.* Government jobs are especially lucrative in areas facing widespread unemployment. One such area is southern Illinois, where it is difficult to find any jobs in the private sector much less jobs with good salaries. Government contracts, on the other hand, generally are not more lucrative than private sector contracts. An independent contractor who engages in the competitive bidding process is not expected to charge a higher price to the government than it would to a private entity. Any independent contractor who did bid a higher price to the government would be awarded few public contracts.

In addition, many government workers cannot look to the private sector for similar employment. Independent contractors are generally not limited to the public sector since most independent contractors can compete for both public and private sector contracts. However, for a temporary highway

maintainer like the plaintiff, there is no equivalent to his job in the private sector. The *Rutan* Court recognized this in outlining the importance of a state job. "There are ... occupations for which the government is a major (or the only) source of employment.... Thus, denial of a state job is a serious privation." 497 U.S. at 77, 110 S.Ct. at 2738.

Independent contractors are also not analogous to temporary employees in their political affiliation. As the *Downtown* court noted, independent contracting firms that have extensive government business are often "political hermaphrodites" that protect themselves by having connections to both major political parties. 938 F.2d at 709 (citing *LaFalce,* 712 F.2d at 294). Temporary employees do not have this luxury because as individuals they can generally affiliate themselves with only one political party at a time. Additionally, a number of independent contractors are corporations that do not vote and, therefore do not have to declare a particular political affiliation at election time.

It is also important to note that the *LaFalce* decision relied upon a cost-benefit analysis—i.e., "Judge Posner weighed the costs of further subjecting this country's long-established patronage system to first amendment scrutiny against the benefits to a contractor's exercise of first amendment rights and concluded that, in the case of contractors, the costs outweighed the benefits." *Triad,* 892 F.2d at 587. This analysis is based, at least in part, upon the fact that the sheer volume of government contracts is considerably larger that the number of government jobs. "[A] rule upholding a company's First Amendment right to have its bid considered without regard to politics would 'invite every disappointed bidder for a public contract to bring a federal suit against the government purchaser.'" *Downtown,* 938 F.2d at 709. The court expressed "a concern about flooding the federal courts with new First Amendment claims." *Id.* While acknowledging that *Rutan* marked an expansion of such First Amendment claims, the court relied heavily on the fact that *Rutan*'s precedential effect is limited to "the context of government employment." *Id.* "Thus, to the ex-

tent that protection granted to public employees under the *Elrod–Branti* line of cases may be extended to contractors, we leave that extension to the Supreme Court." *Triad,* 892 F.2d at 588. Affording First Amendment protection to temporary employees would not be an extension of rights because the right to protection as a public employee already exists.

One final difference between a temporary employee and an independent contractor is the level of control the employer has over the method in which the work is done. Generally an independent contractor is subject to the employer's control only as to the final result of the work. However, an employee is subject to his employer's desires as to both the end product and the means by which it is to be accomplished. In the case at bar, the plaintiff alleged his employment duties "were the same as the duties of the full time, civil service highway maintainer position. . . ." Amended Complaint ¶ 12. Even though their length of service is determined by contract, temporary employees are subject to their employer's control and direction over the details of their work in the same way that permanent employees are subject to their employer's control and direction. Independent contractors are not subject to these restrictions.

In fact, because independent contractors do not have supervisors who monitor their work, they are more like the high-ranking supervisors/decisionmakers the *Rutan* Court allowed to be selected or dismissed based on political affiliation. "A government's interest in securing employees who will loyally implement its policies can be adequately served by choosing or dismissing certain high-level employees on the basis of their political views." *Rutan,* 497 U.S. at 74, 110 S.Ct. at 2737. Thus, like high-level employees, independent contractors do not have supervisors and can be hired or dismissed on the basis of political affiliation to ensure that their work is done in accordance with the party's philosophies.

 For these reasons, the Court concludes that the Supreme Court's decision in *Rutan* must encompass both temporary and permanent employees. Temporary employees are not analogous to independent contractors who may be hired or fired on political grounds. Absent a vital governmental interest, *all* hiring, promotion, transfer, recall, and dismissal decisions conditioned on political belief and association are unconstitutional, regardless of the length of time the individual will serve. The defendants have identified no such governmental interest here. Therefore, the Court **DENIES** the state officials' motion to dismiss to the extent that it seeks dismissal of Count I for failure to state a claim.

### B. Qualified Immunity.

 The state officials assert that this Court should dismiss plaintiff's claim for compensatory and punitive damages on qualified immunity grounds because the plaintiff cannot establish the existence of a clearly established right. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In determining whether qualified immunity applies, an objective standard is applied. *Id.* "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Thus, a qualified immunity analysis involves a purely objective inquiry to determine whether, at the time of the alleged illegal act, the right asserted by the plaintiff was clearly established in the particular factual context presented. *Cleveland–Perdue v. Brutsche,* 881 F.2d 427 (7th Cir.1989); *Doe v. Bobbitt,* 881 F.2d 510 (7th Cir.1989).

 It is significant to note that the plaintiff is asking for damages only in Count I of the complaint, which is based on the use of political patronage in hiring temporary

employees as highway maintainers.[6] Vickery alleges that the defendants violated his constitutional rights by refusing to renew his six-month contract. Therefore, the question is whether the law was "clearly established" that *Rutan* applied to temporary employees. *See Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir.1987) ("[T]he test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted.").

The plaintiff asserts that *Rutan* clearly applied to temporary employees at the time that it was decided because one of the plaintiffs in *Rutan*, Ricky Standefer, was a temporary employee. But it is far from clear that the Supreme Court made its decision on that basis. In fact, there is no indication whatsoever that Standefer's status as a temporary employee was raised or argued as an issue. Rather, the Supreme Court's analysis turns only upon his status as "a state garage worker who claims that he was not recalled, although his fellow employees were, because he had voted in a Democratic primary and did not have the support of the Republican Party." 497 U.S. at 67, 110 S.Ct. at 2733.

The Supreme Court construed the *Rutan* complaint as alleging that Standefer and a co-plaintiff, Dan O'Brien, "were not recalled after layoffs because they lacked Republican credentials." *Id.* Their claims are listed in the complaint under the subheading of "Plaintiffs Who Have Been Laid Off By The State Of Illinois and Not Rehired." Rutan Complaint, at 6. The complaint then alleges that "[p]laintiffs, Dan O'Brien and Ricky Standefer, are residents, taxpayers and voters of the State of Illinois and are members of and appropriate representatives of a class of persons who have been laid off from employment in departments, boards or commissions under the jurisdiction of the Governor and who have been and are prevented or impaired from being recalled to work or prevented or impaired from an equal opportunity to obtain employment with the State of Illinois because they are not deemed politi-

cally acceptable or approved by Defendants." Rutan Complaint ¶ 9a.

The complaint does briefly mention that Standefer had been "hired in a temporary position" at the state garage. *Id.* ¶ 21a. This same fact also was mentioned in the district court's opinion, the Seventh Circuit's opinion, and the state's brief filed in the Supreme Court. However, the mere fact that this status was mentioned is not dispositive of the issue. What is critical is whether the parties *argued* that his status as a temporary employee would affect his claim or whether the Supreme Court expressed any opinion as to whether such status might be relevant. There is no indication that Standefer's status as a temporary employee was raised as an issue. Nor is there anything in *Rutan* to suggest that the Supreme Court took this status into consideration. Instead, the Court's opinion focused only on Standefer's classification as a person who was not recalled after a layoff.

Under these circumstances, it was not clear from *Rutan* itself that the decision covered temporary employees. In fact, at the time of the alleged violation in this case, other circuits had suggested that *Rutan* may be limited to career employees only. *Roque-Rodriguez v. Lema Moya*, 926 F.2d 103, 107 (1st Cir.1991). Accordingly, the Court finds that at the time of the alleged violation, it was not "clearly established" that *Rutan* applied to temporary employees. Therefore, the Court hereby GRANTS the state officials' motion to dismiss based upon qualified immunity.

■ Qualified immunity shields defendants in their individual capacities only. *Knox v. McGinnis*, 998 F.2d 1405, 1412 (7th Cir.1993); *Hadi v. Horn*, 830 F.2d 779, 782 (7th Cir.1987). Therefore, the action for damages against the state officials in their individual capacities is DISMISSED. The plaintiff's request for declaratory and injunctive relief against these parties in their individual capacities will proceed.

---

6. Count II seeks joint injunctive and declaratory relief. Therefore, the qualified immunity analy- sis only applies to Count I.

The Court further notes that two of the state officials, Peerman and Brown, are also sued in their official capacities. However, a suit against a state official in his official capacity is a suit against the state for Eleventh Amendment purposes. *Papasan v. Allain,* 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Although the defendants have not raised the Eleventh Amendment as a defense, the amendment is a jurisdictional bar and must be raised by the Court *sua sponte. Mathes v. Nugent,* 411 F.Supp. 968 (N.D.Ill. 1976). Absent a waiver by the state or a congressional override, such suits are barred by the Eleventh Amendment to the extent that they seek to recover monetary damages. *Kroll v. Board of Trustees of the University of Illinois,* 934 F.2d 904, 907–08 (7th Cir. 1991). Since there is no evidence of such consent or congressional override applicable to this case, the Eleventh Amendment bars suit against these defendants for monetary damages. Therefore, the action for damages against Peerman and Brown in their official capacities also must be **DISMISSED.**

The Eleventh Amendment does not bar official capacity actions to the extent that they request prospective relief—i.e., an injunction. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). "An action for prospective injunctive relief against a state official is brought properly in the official's *official* capacity." *Akins v. Board of Gov. of State Colleges & Univ.,* 840 F.2d 1371, 1377 (7th Cir.) (emphasis in original), *vacated on other grounds,* 488 U.S. 920, 109 S.Ct. 299, 102 L.Ed.2d 319 (1988); *Scott v. Lacy,* 811 F.2d 1153, 1153–54 (7th Cir.1987). Therefore, the claims for injunctive relief in Counts I and II shall also proceed against defendants Peerman and Brown in their official capacities.

### III. Certification as a Class Action

Plaintiff claims he is a member and appropriate representative of two classes of persons. First, under Count I, he seeks to represent all persons denied the position of full-time temporary highway maintainer for periods of six months due to their political affiliation or non-affiliation or their lack of support by the Republican Party. Second, under Count II, he seeks to represent all persons denied the position of permanent highway maintainer, as established under the Illinois Personnel Code, due to their political affiliation or non-affiliation or their lack of support by the Republican Party. The state officials allege the class allegations must be dismissed as a matter of law for failure to satisfy the requirements of Rule 23(a) of the Federal Rules of Civil Procedure.

As a preliminary matter, the Court notes that the plaintiff has filed a motion to amend the complaint to more correctly describe the two highway maintainer positions at issue. The defendants have not objected to this motion and the Court finds that the amendment would make the pleadings easier to understand. Therefore, the Court GRANTS this Motion to Amend the Complaint (Doc. 51).

### A. Class Certification Under Rule 23.

Rule 23(a) provides that representatives may sue on behalf of a class if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

In addition, the court must find that: (1) the prosecution of separate actions by individual class members would create inconsistent adjudications or impair the ability of other class members to protect their interests; (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class; or (3) questions of law or fact common to members of the class predominate over questions affecting individual members so that a class action is superior to other methods of adjudicating the controversy. *Id.* Rule 23(b). The party seeking class certification bears the burden of showing that certification is proper. *Trotter v. Klincar,* 748 F.2d 1177, 1184 (7th Cir.

1984). Failure to meet any one of the requirements of Rule 23 precludes certification of a class. *Patterson v. General Motors Corp.*, 631 F.2d 476, 480 (7th Cir.1980), *cert. denied*, 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981).

### 1. Numerosity.

■ Determining a proposed class is so numerous that joinder of all members is impracticable does not mean that a complaint must allege the exact number or identity of all class members. *Patrykus v. Gomilla*, 121 F.R.D. 357, 360 (N.D.Ill.1988) (citing 1 H. Newberg, Newberg on Class Actions § 3.05 (2d ed. 1985)). This Court is entitled to make common sense assumptions to support a finding of numerosity. *Grossman v. Waste Mgt., Inc.*, 100 F.R.D. 781, 785 (N.D.Ill.1984).

■ Plaintiff alleges that since *Rutan* was decided, more than 2,000 persons have become eligible for the position of full-time temporary or permanent highway maintainer. Plaintiff's Brief in Support of Class Action at 3–5. Based on this fact, Vickery asserts that there are at least 2,000 members of each class, which satisfies the numerosity requirement. Defendants do not challenge this assertion, and the Court agrees that a class size numbering in the thousands meets the numerosity requirement. *See Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 407 (N.D.Ill. 1987) (numerosity satisfied for class estimated at more than a thousand potential members). Therefore, the numerosity requirement of Rule 23(a) is met.

### 2. Commonality and Typicality.

■ Courts have recognized that the commonality and typicality requirements tend to merge. *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225 (7th Cir.1983). "Both serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected...." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982).

"Where a question of law refers to a standardized conduct of the defendants toward members of the proposed class, a common nucleus of operative facts is typically presented, and the commonality requirement ... is usually met." *Franklin v. City of Chicago*, 102 F.R.D. 944, 949 (N.D.Ill.1984). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Resnick v. American Dental Ass'n*, 90 F.R.D. 530, 539 (N.D.Ill.1981) (citing Newberg, Class Actions § 1115(b) at 185 (1977)).

The state officials assert this Court should dismiss the class action allegations based on the Fourth Circuit's holding in *Stott v. Haworth*, 916 F.2d 134 (4th Cir.1990), which questioned the appropriateness of class treatment of political patronage cases. In *Stott*, the plaintiffs, who "held an array of jobs," sought class certification to show a pattern or practice of patronage dismissals. The court found that the plaintiffs did not satisfy commonality and typicality because "[t]he only question common to each member of the class is whether or not his or her position was one that was subject to patronage dismissal." 916 F.2d at 145. The court found this required a "position by position" analysis of the constitutional claims raised. *Id.*

The case at bar is distinguishable because it is clear that each putative class member sought or held the position of highway maintainer. It is also clear, as discussed above, that the position of highway maintainer is subject to the *Elrod–Branti–Rutan* prohibition on political patronage. The Court further notes that the plaintiff's remaining claims are limited to injunctive and declaratory relief, which eliminates the need to determine individual monetary awards for each plaintiff. Therefore, the individualized determinations called for by *Stott* are unnecessary for the putative class.

The *Stott* court went on to say that "[c]lass certification is only proper when a determinative critical issue overshadows all other issues." *Id.* In the case at bar, the issue of whether the alleged practice or course of conduct—i.e., the patronage system—violat-

ed the constitutional rights of the putative class members overshadows all other issues.

The state officials also argue that class certification is improper because each class member will have to demonstrate that "but for" party affiliation or support, he would have been hired. *See Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (where constitutionally protected conduct was a motivating factor in decision not to rehire teacher who had been involved in several "incidents," inquiry should have addressed whether same decision would have been reached in absence of protected conduct). But the putative class members in this case are not in the same situation as the litigants in *Stott* and *Mt. Healthy.* The putative classes in this case consist of individuals who possess the basic qualifications for the job, but are not considered because of their political affiliation. In addition, the claims upon which the class action would proceed are only for injunctive and declaratory relief. The claims only seek a prohibitive and equitable remedy to prevent the conduct from occurring again. Thus, the classes Vickery wishes to represent are specifically tailored to those individuals who would have been considered for employment "but for" their political affiliation or support. No individualized determination is necessary; there is no need to make an individual "but for" determination for a class composed solely of "but fors."

The Seventh Circuit has held that commonality was satisfied when the putative plaintiffs alleged they were subjected to "an institutionalized course and pattern of unconstitutional conduct" by various government agencies and employees. *Alliance To End Repression v. Rochford,* 565 F.2d 975 (7th Cir.1977). Likewise, the Seventh Circuit upheld the trial court's finding that typicality had been satisfied when "[t]he major claims of the plaintiffs ... are directed at the recruiting and disclosure practices" of the defendants where "[a]ll members of the class were subject to the same allegedly unlawful practices." *De La Fuente,* 713 F.2d at 232–33. Plaintiff claims the alleged patronage system adversely affected all the class members because they did not have Republican Party support. Since a common question of law referring to the standardized conduct of defendants predominates and individualized determinations are not necessary, plaintiff Vickery has satisfied the commonality and typicality requirements of Rule 23(a).

### 3. Fair and Adequate Representation.

Defendants assert that Vickery is an inadequate class representative because he is a political and financial supporter of the Republican Party and because he initially received the job in question as a result of Republican support. They claim that by being a Republican, plaintiff cannot fairly and adequately represent the class because there may be unique defenses to his claim that do not apply to the putative classes.

Plaintiff is not alleging that the class is composed of only non-supporters of the Republican Party, but that it is composed of individuals denied the position of highway maintainer "due to their political affiliation or non-affiliation or their lack of support by the Republican Party." Amended Complaint ¶ 4. Thus, the inquiry is not only whether proposed class members supported the Republican Party, but also whether the Republican Party supported the proposed class members. A putative class member may be affiliated with the Republican Party, but he might not carry its support. For example, an individual may be affiliated with the Republican Party and vote in Republican elections but choose not to contribute money or time to support any particular candidate. Denying this person an employment opportunity solely because of his support for the party's candidate has virtually the same coercive effect on his freedom to believe and associate—or not to believe and associate— as it would have on an individual who has not affiliated with the party at all.

Therefore, it does not matter that the plaintiff admits that he is Republican and that he initially obtained the temporary position by political sponsorship. The important fact is that he has alleged that he lost the support of the Republican Party and, allegedly, the possibility of renewal of his contract, when his political sponsor no longer had political clout. That is sufficient to bring his claim within the class of plaintiffs recog-

nized in *Elrod, Branti,* and *Rutan*—i.e., plaintiffs who can prove that they suffered an adverse employment decision "solely because they were not affiliated with or supported by" the Republican Party. *Branti,* 445 U.S. at 517, 100 S.Ct. at 1294.

■ Plaintiffs who obtain employment by political patronage are not prevented from challenging their employment termination when their sponsors lose political clout. In fact, in *Elrod,* the plaintiffs challenged by class action the termination of their employment because they were not affiliated with or sponsored by a particular political party. The plaintiffs had obtained the very jobs they were clinging to by virtue of their political affiliations. 427 U.S. at 377, 96 S.Ct. at 2691 (Powell, J., dissenting).

■ The Court finds that plaintiff Vickery is a typical representative of the class because he does not have the sponsorship of the Republican Party for the highway maintainer position. In addition, plaintiff's attorneys, Leahy Law Offices, will adequately represent the class. Leahy Law Offices represented the plaintiff class in *Rutan* from 1985 through settlement in 1992. The Court, therefore, concludes that the plaintiff has met the requirements of numerosity, commonality, typicality and adequacy of representation contained in Rule 23(a).

**4. Additional Requirements of Rule 23(b).**

■ In addition to satisfying Rule 23(a), a class action must satisfy at least one element of Rule 23(b). Plaintiff does not specify which section of Rule 23(b) his claim falls under. However, the Court finds that the action would be proper under Rule 23(b)(2) because the defendants acted on allegedly unconstitutional grounds generally applicable to all class members and the complaint seeks declaratory and injunctive relief. Rule 23(b)(3) also is applicable because common questions of law concerning the constitutionality of defendants' behavior clearly predominate, making a class action the superior method to adjudicate the controversy.

Based on this analysis, the Court finds that plaintiff Vickery has satisfied the requirements of Rule 23(a) and (b). Accordingly, the Court hereby **GRANTS** plaintiff's Motion to Certify Action as Class Action (Doc. 21) and **DENIES** the State Officials' Motion to Dismiss Plaintiff's Class Allegations (Doc. 29).[7]

### CONCLUSION

The motion to dismiss filed by defendants Roberts and the Saline County Republican Central Committee is GRANTED (Doc. 22). The plaintiff's Motion to Strike is **GRANTED** (Doc. 73). The State Officials' Motion to Dismiss the Amended Complaint (Doc. 27) is **GRANTED IN PART AND DENIED IN PART.**

Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** the claims against Roberts and the Saline County Republican Central Committee in their entirety and DISMISSES the monetary damages claims against the state officials in Count I. The claims for declaratory and injunctive relief in Counts I and II will proceed against the state officials in both their individual and official capacities.

The plaintiff's first Motion to Amend the Complaint is **GRANTED** (Doc. 51), but the second motion to amend is **DENIED** (Doc. 54). The Plaintiff's Motion to Certify Action as Class Action is **GRANTED** (Doc. 21) and the state officials' Motion to Dismiss Plaintiff's Class Allegations is **DENIED** (Doc. 29).

The Court further **INSTRUCTS** the parties to file suggestions on how this matter shall proceed based on the above rulings— e.g., to suggest whether further discovery is required or whether the remaining issues can be decided on a motion without further discovery. These suggestions shall be filed on or before **August 5, 1994**.

**IT IS SO ORDERED.**

---

7. It is important to note that this decision is based upon the fact that the plaintiff's remaining claims are only for injunctive and declaratory relief. Thus, the Court may reconsider the class certification issue if, for whatever reason, the plaintiff's claims for monetary damages are reinstated in the future.