Gary **VICKERY**, Plaintiff–Appellant, Cross–Appellee,

v.

Janell **JONES**, William Pearman and Kirk Brown, Defendants–Appellees, Cross–Appellants,

and

Saline County Republican Central Committee and William Roberts, Defendants–Appellees.

Nos. 96–1055, 96–1163.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 6, 1996.

Decided Nov. 22, 1996.

.Mary L. Leahy (argued), Cheryl R. Jansen, Springfield, IL, for Gary Vickery.

Jeffrey D. Colman (argued), Edward J. Lewis, II, David Jimenez–Ekman, Jenner & Block, Chicago, IL, Charles R. Schmadeke, Office of the Attorney General, Criminal Appeals Division, Springfield, IL, for Janell Jones and William Pearman in No. 96–1055.

Craig S. Burkhardt (argued), Peggy J. Ryan, Sorling, Northrup, Hanna, Cullen & Cochran, Springfield, IL, for William Roberts and Saline County Republican Cent. Committee in No. 96–1055.

Jeffrey D. Colman, Edward J. Lewis, II, David Jimenez–Ekman, Jenner & Block, Chicago, IL, for Kirk Brown in No. 96–1055.

Jeffrey D. Colman (argued), Edward J. Lewis, II; David Jimenez–Ekman, Jenner & Block, Chicago, IL, for Janell Jones, William Pearman and Kirk Brown in No. 96–1163.

Before CUMMINGS, BAUER and KANNE, Circuit Judges.

CUMMINGS, Circuit Judge.

On January 27, 1993, plaintiff Gary Vickery brought this action against certain Illinois state officials (the "State Defendants") and certain members of the Illinois Republican Party (the "Party Defendants"), alleging

that the State Defendants and Party Defendants acted under color of law in violation of 42 U.S.C. §§ 1983 and 1988 in maintaining and operating a political patronage system in which political and financial supporters of the Republican Party of the State of Illinois are favored in regard to state employment as highway maintainers and alleging that his failure to be appointed to a temporary highway maintainer position violated his rights under the First and Fourteenth Amendments. Vickery represents two plaintiff classes: (i) Class A, consisting of all persons denied the position of temporary highway maintainer with the Illinois Department of Transportation ("IDOT") on the basis of political affiliation, who contend that IDOT's consideration of political affiliation in appointing temporary highway maintainers violated their First and Fourteenth Amendment rights under the Supreme Court's decision in *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52, and (ii) Class B, consisting of all persons denied the position of permanent highway maintainer on the basis of political affiliation, who contend that the use of temporary highway maintainers was a scheme to circumvent the *Rutan* decision.

On July 6, 1994, the district court issued an opinion and order denying the State Defendants' motion to dismiss the plaintiff's claims for failure to state a claim, but granting the State Defendants qualified immunity as to the plaintiff's request for monetary damages. *Vickery v. Jones*, 856 F.Supp. 1313 (S.D.Ill.1994). At the same time, the court granted the motion of the Party Defendants to dismiss the plaintiff's complaint for failure to state a claim upon which relief could be granted against them. *Id.* On December 6, 1995, the court entered a declaratory judgment on the pleadings in favor of the plaintiff to the effect that the "defendants' use of political affiliation as a criterion for hiring temporary highway maintainers is unconstitutional" under the *Rutan* decision, but entered a final judgment on the pleadings in favor of the State Defendants on all of the plaintiff's other claims for monetary, injunctive and declaratory relief. *Vickery v. Jones*, No. 93 C 4030, final judgment at 2 (S.D.Ill.Dec. 6, 1995).

Plaintiff appeals the district court's denial of other injunctive and monetary relief against the State Defendants and its final judgment in favor of the Party Defendants. The State Defendants cross-appeal the district court's entry of the declaratory judgment in favor of plaintiff. We affirm.

I.

The following facts are undisputed: IDOT is responsible for the design, construction and maintenance of roadways across the State of Illinois. During the winter season, those responsibilities include the removal of snow and ice from the State's roadways. To fulfill its responsibilities, IDOT uses a workforce of both permanent, full-time "highway maintainers" and highway maintainers who have been appointed to temporary, seasonal positions. Temporary highway maintainers perform the same duties as permanent highway maintainers when they are working, but they do not receive certain traditional benefits of State employment, such as health insurance coverage, pension plan participation or vacation time. During the 1990–91 snow season, IDOT hired 750 temporary highway maintainers for the season. By the 1993–94 snow season, such number had grown to 1,133.

In 1990, the Supreme Court held in *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52, that public employers could not base promotion, recall, transfer or hiring decisions on political affiliation or political support, except with respect to certain policy-making positions for which political affiliation is an appropriate requirement. Immediately following the decision in *Rutan*, then Illinois Governor Thompson declared in an Administrative Order that "No hiring or other personnel decisions—including promotions, transfers or recalls from layoff—may be decided on the basis of the candidate's party affiliation or support." Administrative Order No. 1 (1990). After Jim Edgar became Governor of Illinois in 1991, he reaffirmed and adopted Governor Thompson's Administrative Order No. 1. In May 1991, Governor Edgar determined that temporary employees would be treated as ex-

empt from the holding in *Rutan*, with the result that political considerations could be taken into account in filling those positions. In 1992, the parties in the *Rutan* litigation reached a settlement upon remand to the district court. The settlement included an undertaking by the State to publish a list of positions that were exempt from the *Rutan* holding and Administrative Order No. 1. The position of temporary highway maintainer did not appear on that list of positions.

The State Defendants admit that, prior to July 5, 1994, "they considered a variety of factors in awarding temporary highway maintainer positions in IDOT, including but not limited to prior work experience at IDOT, recommendations or referrals from a variety of sources, and affiliation with or support by representatives of the Republican Party." At a hearing on August 31, 1994, defendant William Pearman, head of the Office of Personnel at IDOT, described how the position of temporary highway maintainer was filled. He testified that for the snow seasons following May 1991 through July 1994, he used the same system to fill the temporary positions. First, in most cases, he ran the name of each employee who had worked the previous year by the employee's Republican County Chairman. If the County Chairman approved, the employee was called back to work so long as certain prerequisites (such as a valid commercial driver's license, drug test and a physical) were satisfied. If the County Chairman did not approve, in most cases that person was not called back to work. If there was a vacant temporary position, the County Chairman was often notified, and then, in most cases, either the County Chairman referred a person to IDOT or the name of a candidate was submitted to the County Chairman for approval.

Randy Vickery, plaintiff's brother, was Chairman of the Gallatin County Republican Central Committee from March 1990 to March 1992. While he was County Chairman, he called Pearman's office and told him the persons he wanted selected as temporary highway maintainers and was involved in the selection of plaintiff as a temporary highway maintainer. Gary Vickery worked in that capacity from September 30, 1991, to March 31, 1992, at IDOT's shed at Harrisburg, Illinois. The parties agree that he performed his duties in an acceptable manner. However, in April 1992, at the expiration of Gary Vickery's contract, William Eugene Bethel was awarded a six-month contract as temporary highway maintainer instead of Vickery. That position was not advertised or posted in any way. Randy Vickery had ceased to be Republican County Chairman in March 1992.

Since the district court's July 6, 1994 opinion, the State Defendants have taken action to end the policy of considering political affiliation in the selection of temporary employees. Governor Edgar's chief counsel issued a new policy to all agency directors and their chief legal counsel, prohibiting the hiring or firing of temporary employees based on political affiliation, and IDOT established new procedures to fill vacant temporary highway maintainer positions, including the posting of available temporary highway maintainer positions at IDOT facilities around the State. Additionally, an application and evaluation process has been established that does not consider political affiliation.

## II.

This Court has recently decided the case of *Tarpley v. Jeffers*, 96 F.3d 921 (7th Cir.1996), which raised issues similar to those raised in this case. In 1992, Tarpley applied for a permanent job as a power plant maintenance worker at an Illinois state-run facility. He was denied the job in favor of Harold Blessing, who had been filling the job for several months on a temporary basis upon the recommendation of a Republican County Chairman. Tarpley alleged that Blessing obtained the temporary position as well as the permanent position because of his affiliation with the Republican Party, in violation of Tarpley's First Amendment rights.

The district court in *Tarpley* granted summary judgment to all defendants. With respect to the filling of permanent positions, the court held, and we agreed, that (i) Tarpley had not shown that he would have been given the job but for Blessing's political affiliation, because other interviewees had received higher rankings in the interviewing process, and (ii) Tarpley had not presented

**1338**

sufficient evidence of a scheme on the part of Illinois officials to avoid the dictates of *Rutan* by using interim positions rather than filling permanent positions. *Id.* at 929–930. With respect to temporary positions, the district court found that *Rutan* did cover hiring for temporary positions, but that the state officials were entitled to qualified immunity because the *Rutan* constitutional principle was not clearly established at the time of the claimed constitutional violation. This Court agreed, but remanded for a determination of *Tarpley's* standing. *Id.* at 923–924, 927. However, the Republican Party defendants in *Tarpley* had failed to argue any basis for claiming qualified immunity or any other defense. Instead, they had argued that *Rutan* did not apply to the filling of temporary positions and that the state officials were protected by qualified immunity. We therefore reversed the grant of summary judgment as it pertained to the Republican Party defendants and remanded for a determination of the merits. *Id.* at 924.

### III.

The plaintiff classes first argue that the district court erred by concluding that the State Defendants were entitled to qualified immunity when they considered political affiliation in filling the position of temporary highway maintainer. Second, they challenge the district court's judgment in favor of the State Defendants with respect to the Class B plaintiffs' claim that temporary full-time positions were deliberately used to avoid filling permanent, full-time positions in contravention of *Rutan*. Finally, they assert that the district court erred when it concluded that plaintiff had failed to state a claim against the Party Defendants upon which relief could be granted. Each argument will be addressed in turn.

### A.

■ The plaintiff first challenges the district court's holding that the State Defendants were entitled to qualified immunity when they filled temporary highway maintainer positions by considering the political affiliation of the candidates. In *Tarpley v. Jeffers*, 96 F.3d 921, 927, this Court laid out a three-level inquiry applicable to this type of case:

First, is patronage hiring unconstitutional in the circumstances of this case? Second, if so, was the unconstitutionality clearly established or are the state defendants entitled to qualified immunity? Third, did [the plaintiff] suffer an injury by virtue of the defendants' actions?

If this Court finds in answer to the second inquiry that the State Defendants were entitled to qualified immunity, then, whatever the answers to the first and third inquiries, our inquiry ends, because the district court has addressed the first inquiry, finding that the State Defendants' consideration of political affiliation in hiring temporary highway maintainers was unconstitutional, and its finding is not challenged on appeal. Similarly, if the State Defendants are entitled to qualified immunity, the third inquiry becomes irrelevant because seeking damages against them is prohibited, even if the plaintiff suffered an injury by virtue of the State Defendants' actions.

Qualified immunity shields government officials who are performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396. Whether the State Defendants will be protected by qualified immunity "turns on the 'objective legal reasonableness' of the action, *Harlow*, 457 U.S., at 819[102 S.Ct. at 2739], assessed in light of the legal rules that were 'clearly established' at the time it was taken, *id.*, at 818[102 S.Ct. at 2738]." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523. As the Court stated in Anderson:

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ...; but it is to say that in the light of pre-

existing law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039 (citations omitted). This Court has stated several times that a plaintiff may show that a legal rule was "clearly established" by either providing a "closely analogous" case covering both the right at issue and its application to the facts of the case at hand or showing that a reasonable person would have known that they were violating the law because such violation was so obvious. *See Erwin v. Daley,* 92 F.3d 521, 525 (7th Cir.1996); *Kernats v. O'Sullivan,* 35 F.3d 1171, 1177 (7th Cir.1994); *McDonald v. Haskins,* 966 F.2d 292, 293 (7th Cir.1992); *Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.1988) (en banc), certiorari denied, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534.

The plaintiff asserts that *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574; *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547; *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570; and *Illinois State Employees Union v. Lewis,* 473 F.2d 561 (7th Cir.1972), certiorari denied, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590, are analogous to the case at hand and "clearly established" that patronage hiring in filling temporary positions is unconstitutional. However, each of these cases involved the discharge of a full-time non-civil service employee based on political association. The plaintiff submits that these non-civil service employees are temporary employees, like the temporary highway maintainers, because they could be fired for any reason or no reason at all. In other words, they had no legal entitlement to continued employment. Similarly, the plaintiff contends that the plaintiff in *Perry* held a temporary position analogous to the temporary highway maintainer position because he was a state college teacher without any contractual or tenure right to re-employment, and the plaintiff points out that the Supreme Court held that such lack of right was immaterial to his right to bring a First Amendment claim. 408 U.S. at 597, 92 S.Ct. at 2697–98. The plaintiff's attempt to analogize *Branti, Elrod, Perry* and *Lewis* to the facts of this case is not persuasive. We seriously question whether the Supreme Court and this Court really

believed that they were addressing the constitutionality of patronage hiring for positions like the temporary highway maintainer in this case, which positions are clearly defined as short-term, when they were deciding the constitutionality of patronage hiring or firing for full-time non-civil service positions in *Branti, Elrod, Perry,* and *Lewis.*

The plaintiff also points out that one of the plaintiffs in the *Rutan* case had been laid off from a temporary position at the state garage, and that the Supreme Court drew no distinction in its opinion as to the duration of employment of any of the plaintiffs in that case. The district court properly rejected this argument, emphasizing that "it was far from clear that the Supreme Court made its decision on that basis." *Vickery v. Jones,* 856 F.Supp. at 1326. The temporary worker in *Rutan* was not challenging a failure to obtain a temporary position; his allegation related instead to the fact that he was not recalled to a new state job after he had been laid off. *Rutan,* 497 U.S. at 67, 110 S.Ct. at 2733. As the district court pointed out, the fact that the worker's prior status as a temporary worker was mentioned in connection with the *Rutan* decision is not dispositive; "[w]hat is critical is whether the parties *argued* that his status as a temporary employee would affect his claim or whether the Supreme Court expressed any opinion as to whether such status might be relevant." 856 F.Supp. at 1326 (emphasis in original). There is no indication that either occurred. Although the plaintiff claims that *Elrod, Branti* and *Rutan* "clearly established" that it is the nature of the work, rather than the duration of the position, that determines whether a position may be filled using political considerations, we disagree.

Prior to the district court's July 6, 1994 opinion, no court had explicitly decided the question whether the protection afforded in *Rutan* extended to temporary workers. This Court had held on several occasions that *Rutan* did not protect independent contractors from hiring or firing based on political considerations. *See, e.g., O'Hare Truck Service, Inc. v. City of Northlake,* 47 F.3d 883 (7th Cir.1995), reversed, — U.S. —, 116 S.Ct. 2353, 135 L.Ed.2d 874; *Downtown*

*Auto Parks, Inc. v. City of Milwaukee,* 938 F.2d 705 (7th Cir.1991), certiorari denied, 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 657. Finding that the position of a temporary worker was more analogous to that of a permanent, full-time worker than that of an independent contractor, the district court held that *Rutan* did extend to temporary workers. *Vickery v. Jones,* 856 F.Supp. at 1325. In light of the Supreme Court's recent decision in *O'Hare Truck Service, Inc. v. City of Northlake,* —— U.S. ——, 116 S.Ct. 2353, 135 L.Ed.2d 874, which held that government employers may not discharge an independent contractor based on an exercise of its rights of political association or the expression of political allegiance, the State Defendants do not challenge the district court's conclusion on appeal, and we are not required to address the correctness of the district court's conclusion that *Rutan* extends to temporary workers like the highway maintainers at issue in this case.

If we had been presented the question whether *Rutan* extends to the hiring of temporary highway maintainers, perhaps the Court would agree with the plaintiff's assertion that certain language in the *Elrod, Branti, Rutan* or *Lewis* cases would require an affirmative answer, especially after the *O'Hare Truck Service* decision. However, as we concluded in *Tarpley,* "whatever may be the constitutional status of patronage hiring for temporary positions [after *O'Hare Truck Service*], it was not clearly established at least prior to *O'Hare Truck Service*." *Tarpley v. Jeffers,* 96 F.3d at 927. We simply do not agree with the plaintiff's assertion that the constitutional status of patronage hiring of temporary positions was clearly established at the time of the activities challenged in this case. For the reasons stated above, the plaintiff has not provided a "closely analogous" case that covers both the *Rutan* holding and its application to temporary employment positions like the temporary highway maintainer positions, nor has he shown that using information regarding an applicant's political affiliation was so obviously unconstitutional that the State Defendants should have known that they were violating the law. Therefore, the district court correctly concluded that the State Defendants were entitled to qualified immunity.

The plaintiff classes also point to certain actions and pronouncements of Illinois officials following the *Rutan* decision that purportedly require this Court to deny the State Defendants the protection of qualified immunity based on equitable considerations, even if we find, as we have, that the patronage hiring practices regarding temporary positions are otherwise protected. They argue that the purpose of qualified immunity—*i.e.,* to "strike[ ] a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions," *Wyatt v. Cole,* 504 U.S. 158, 167, 112 S.Ct. 1827, 1833, 118 L.Ed.2d 504—is not furthered when granting qualified immunity would simply "reward deception."

The plaintiff directs our attention to the fact that, as noted above, following the Supreme Court's decision in *Rutan,* then Governor Thompson issued several orders in which he ordered state compliance with that decision. Administrative Order No. 1 (1990) declared that "No hiring or other personnel decisions—including promotions, transfers or recalls from layoff—may be decided on the basis of the candidate's party affiliation or support." After Jim Edgar became Governor of Illinois in 1991, he reaffirmed and adopted Governor Thompson's Administrative Order No. 1. Likewise, the *Rutan* settlement, entered into in 1992, required the State to publish a list of positions that were exempt from the *Rutan* holding and Administrative Order No. 1. Notwithstanding Governor Edgar's determination in mid–1991 that temporary employees would be treated as exempt from the holding in *Rutan* (which was, by itself, at least arguably in contradiction of Administrative Order No. 1), neither the position of temporary highway maintainer nor any other temporary position appeared on such list of positions when it was published in 1992.

The plaintiff in *Tarpley v. Jeffers* made similar arguments regarding the inequity of allowing the Illinois state officials to claim qualified immunity following such actions and

·pronouncements. There this Court responded:

> *Tarpley* implicitly invites us to speculate as to why, if Illinois state officials genuinely believed that temporary positions were exempt from the *Rutan* holding, such positions were never posted on the exempt lists. This might be an interesting question if we were currently conducting an inquiry into compliance with the settlement in the *Rutan* case. Here, however, our job is not to speculate about allegations of non-compliance with a settlement in another case.

96 F.3d at 928.

■ The plaintiff has not provided sufficient evidence that any deliberate deception was practiced by the State Defendants in their public pronouncements. More importantly, the State Defendants correctly assert that the plaintiff has not cited any authority that would support a finding that the State's public pronouncements affect the State Defendants' entitlement to qualified immunity from federal constitutional claims. Although the consistency of some of the state officials' actions and pronouncements following the *Rutan* decision is questionable, the reasoning employed in *Tarpley* is equally applicable to this case.. Therefore, we decline to find that the State Defendants are bound by their public actions or pronouncements and thus lose the protection of qualified immunity.

### .B.

The plaintiff next challenges the district court's judgment in favor of the State Defendants with respect to the Class B plaintiffs' claims that temporary full-time positions were deliberately used to avoid filling permanent, full-time positions in contravention of *Rutan*. The district court addressed the issues surrounding the Class B plaintiffs in the context of the State Defendants' Motion for Judgment on the Pleadings.

The plaintiff alleges in paragraph 21 of his Complaint that:

> The use of the six month contract to fill the position of highway maintainer rather than filling the position under the Personnel Code is designed to circumvent the

United States Supreme Court ruling in [*Rutan*]. . . .

Paragraphs 30 and 33 of the plaintiff's Complaint set forth similar allegations. In each case, the State Defendants have denied the factual allegations. The plaintiff contends that with these allegations, the State Defendants were put on notice that the plaintiff believed that the use of the temporary positions was designed to circumvent *Rutan* because the State Defendants knew that if they filled permanent highway maintainer positions they would have to follow *Rutan*. Without citing any case law, the plaintiff argues that the State Defendants could not, "of course," avail themselves of the protection of qualified immunity if this charge were true. As evidence of such a scheme, plaintiff points to the "dramatic increase" in the use of temporary employees from the 1990-91 snow season to the 1994-95 snow season, and claims that he should have been allowed in discovery to explore how often back-to-back temporaries were used, and then to compare those figures pre-*Rutan* and post-*Rutan*. Thus the plaintiff claims that genuine issues of material fact were raised by the pleadings that precluded the district court's judgment in favor of the State Defendants.

The district court's dismissal for failure to state a claim is reviewed "*de novo*, accepting all the well-pleaded allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiffs." *Travel All Over the World, Inc. v. The Kingdom of Saudi Arabia*, 73 F.3d 1423, 1429 (7th Cir. 1996). Accordingly, the factual allegations in the plaintiff's Complaint will be accepted as true and all reasonable inferences will be drawn in the plaintiff's favor, *id.* at 1428, and the Court will dismiss for failure to state a claim when "it appears beyond a doubt that the plaintiff[ ] can prove no set of facts in support of [his] claims that would entitle [him] to relief," *id.* at 1429–1430; *see also Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80.

The district court found that declaratory relief in favor of the Class B plaintiffs that addressed the motives of the State Defen-

dants in establishing the policy of using political considerations in hiring temporary employees "'would serve no useful purpose as a final determination of rights.'" *Vickery v. Jones,* 878 F.Supp. 1179, 1188 (S.D.Ill.1995), *quoting Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371, 73. Because the district court had already granted declaratory relief to the effect that such policy was unconstitutional, it reasoned that a finding regarding the State Defendants' motives for taking into account political considerations in the temporary employee hiring process would be relevant only if damages were available to the Class B plaintiffs. *Id.* The district court had already found that the State Defendants were protected from an award of damages under the doctrine of qualified immunity. Accordingly, it believed that the State Defendants' motives were irrelevant for purposes of its determination.

The State Defendants first argue that the plaintiff has not provided any evidence that there was any scheme to circumvent *Rutan.* In fact, the only evidence regarding the alleged motives of the State Defendants was provided by defendant Kirk Brown, the Secretary of IDOT, who testified that IDOT's motivation for relying on temporary workers was to save taxpayers' money. More importantly, the State Defendants also assert that their motives in hiring temporary highway maintainers are legally irrelevant. Citing a long list of Supreme Court and Seventh Circuit cases, *see, e.g., Behrens v. Pelletier,* — U.S. ——, ——, 116 S.Ct. 834, 838, 133 L.Ed.2d 773; *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738; *Erwin v. Daley,* 92 F.3d at 525; *Anderson v. Romero,* 72 F.3d 518, 521 (7th Cir.1995); *Gordon v. Degelmann,* 29 F.3d 295, 299 (7th Cir.1994), they claim that even if we assume that they used temporary employees to circumvent *Rutan,* they are entitled to qualified immunity. Therefore, they argue, no useful purpose is served by inquiring into their motives.

In *Tarpley v. Jeffers,* the plaintiff had similarly claimed that Illinois state officials had filled temporary positions "as part of a scheme to circumvent the dictates of *Rutan* with respect to the permanent position." 96 F.3d at 927. This Court concluded that the

plaintiff had not shown sufficient evidence of such a scheme to avoid summary judgment. *Id.* at 930. As in *Tarpley,* the plaintiff classes in this case have cited some facts from which one could, however theoretically, infer that some type of scheme existed to circumvent *Rutan.* However, they have not shown sufficient evidence of a scheme in order to defeat the dismissal of their claim.

■■■ The district court and the State Defendants are correct that an inquiry into the motives of the State Defendants in temporary highway maintainer hiring is legally irrelevant, because the test for qualified immunity is one that is objective rather than subjective. In *Harlow v. Fitzgerald,* the Supreme Court explicitly rejected a subjective, "good faith"/"bad faith" distinction in favor of an objective standard for qualified immunity. 457 U.S. at 815–818, 102 S.Ct. at 2736–2738. The Supreme Court and this Court have reiterated the objective standard many times since the *Harlow* decision, refusing to consider a defendant's subjective motivation. *See, e.g., Wyatt v. Cole,* 504 U.S. 158, 172, 112 S.Ct. 1827, 1836, 118 L.Ed.2d 504 (Scalia, J., concurring) ("[M]odern qualified immunity does not turn upon the subjective belief of the defendant."); *Erwin,* 92 F.3d at 524 ("The inquiry focuses on the objective legal reasonableness of the action, not the state of mind or good faith of the officials in question."); *Anderson,* 72 F.3d at 521 ("Proof of spite does not nullify a defense of immunity. The test for immunity is an objective one." (citations omitted)). The plaintiff's assertion that a deliberate scheme to avoid *Rutan* would preclude qualified immunity is simply incorrect. In fact, this type of case falls into that category of cases that led the Supreme Court to reject a subjective standard of inquiry for qualified immunity claims in *Harlow:*

> [I]t is now clear that substantial costs attend the litigation of the subjective good faith of government officials. Not only are there the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service. There are special costs to "subjective" in-

quiries of this kind.... Judicial inquiry into subjective motivation [ ] may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues. Inquiries of this kind can be peculiarly disruptive of effective government.... [B]are allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery.

457 U.S. at 816–818, 102 S.Ct. at 2737–2738. A finding regarding the State Defendants' motives for taking into account political considerations in the temporary employee hiring process would be relevant only if damages were available to the Class B plaintiffs, and, as shown, the district court correctly found that the State Defendants were protected from an award of damages under the doctrine of qualified immunity, regardless of their subjective motivation. Accordingly, the district court rightly determined that the Class B plaintiffs have failed to state a claim upon which relief may be granted.

### C.

The plaintiff classes also challenge the district court's dismissal of their claims against the Party Defendants for failure to state a claim for which relief may be granted. The district court's dismissal for failure to state a claim is reviewed under the same standard set forth in Part III.B of this opinion.

The district court found that the *Rutan* decision did not expressly prohibit political parties from disseminating information regarding a person's political affiliation or making recommendations based on such political affiliation. 856 F.Supp. at 1318. Moreover, the court noted that the advocacy that a particular person should be hired is political expression, subject to the protection of the Constitution. *Id.* at 1318–1319. Accordingly, the court distinguished between the compiling and distributing of political information or the advocacy of the hiring of a particular individual, which is permissible, and the use of such political information by the State in making its hiring decisions, which is prohibited by *Rutan*. *Id.* at 1319. Thus it held that the plaintiff's failure to allege that the Party

Defendants had actual hiring authority or made actual employment decisions in filling the temporary highway maintainer positions, as opposed to simply making recommendations regarding filling such positions, was fatal to the claims against the Party Defendants.

In response, the plaintiff points out, first, that the complaint in the present case was modeled after the complaint in *Rutan*, and that neither this Court nor the Supreme Court dismissed the claim against the Republican Party defendants in that case. Such an argument might be persuasive if either court had expressly addressed the claim against the Republican Party defendants. However, the district court was correct that the *Rutan* decision did not expressly prohibit political parties from disseminating information regarding political affiliation or making hiring recommendations based on political information. In fact, the Supreme Court did not directly address the plaintiffs' claims against the Republican Party; it only affirmed this Court's judgment reversing the district court's dismissal of the plaintiffs' claims and remanded them for further proceedings. Plaintiff classes' reliance on their complaint being similar to the *Rutan* complaint is simply not dispositive.

The plaintiff also contends that *Adickes v. S.H. Kress and Company*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142, governs. In *Adickes*, the plaintiff was a white school teacher who was refused service in a lunchroom when she was accompanied by six african-american students, and was then arrested for vagrancy when she left the lunchroom premises. She filed a complaint under § 1983 against both the owner of the lunchroom and the policeman who arrested her, claiming that a conspiracy existed between those two parties. The Supreme Court held that:

Although this is a lawsuit against a private party, not the State or one of its officials, our cases make clear that petitioner will have made out a violation of her Fourteenth Amendment rights and will be entitled to relief under § 1983 if she can prove that a [lunchroom] employee, in the course

of employment, and a Hattiesburg policeman *somehow reached an understanding* to deny Miss Adickes service in the [lunchroom], or to cause her subsequent arrest because she was a white person in the company of Negroes.... "Private persons, *jointly engaged with state officials in the prohibited action,* are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a *willful participant in joint activity* with the State or its agents."

*Id.* at 152, 90 S.Ct. at 1605–06 (citing *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1156–1157, 16 L.Ed.2d 267) (emphasis added); *see also Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 186–187, 66 L.Ed.2d 185; *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 941–942, 102 S.Ct. 2744, 2755–2756, 73 L.Ed.2d 482. The plaintiff claims that this is what he has alleged regarding the Party Defendants' behavior. The district court in *Adickes* had held that there was no evidence from which to infer a conspiracy, relying on the defendants' denial of a conspiracy and their statements that no communications were made between the two parties regarding the arrest of Ms. Adickes. Nevertheless, the Supreme Court held that it was error to grant summary judgment on the facts because a policeman had been in the lunchroom while Ms. Adickes was waiting for service and the defendants had not disproven the possibility that this policeman had reached an understanding with a lunchroom employee regarding the refusal to serve; thus a genuine issue of material fact did indeed exist as to the existence of a conspiracy.

The plaintiff also argues in the alternative that the Party Defendants may be held liable under 42 U.S.C. § 1983 because they were performing a function usually performed by a public entity, but they cite no case law to support this proposition. In response to the district court's First Amendment problems with plaintiffs' arguments, they assert that the Party Defendants' association with the State Defendants in filling temporary positions is not protected by the First Amendment because it is speech or association for an illegal or unconstitutional end.

First, we cannot agree that the plaintiff has alleged that the State Defendants and Party Defendants had "reached an understanding" or shown that the Party Defendants had been "wilful participant[s] in joint activity with the State or its agents," as contemplated under an *Adickes* analysis. If the action prohibited under *Rutan* is the hiring, promoting, transferring or recalling of an individual based on his or her political association, since the Party Defendants did not hire, promote, transfer or recall anyone, their screening or recommending the hiring of employees for highway maintainer positions is not the same as being "jointly engaged with state officials in the prohibited action." *Adickes,* 398 U.S. at 152, 90 S.Ct. at 1605–1606.

*National Collegiate Athletic Association v. Tarkanian,* 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469, is instructive. The Supreme Court found that the NCAA's conduct in connection with the imposition of penalties, including a suspension, upon Tarkanian, UNLV's basketball coach, did not constitute state action for purposes of § 1983, reversing the Nevada Supreme Court. The majority opinion emphasized that it was UNLV, the state actor, that was responsible for the actual suspension of Tarkanian. *Id.* at 193, 109 S.Ct. at 462–463. The Court considered the relevant question similar to the one advanced by the parties here, *viz.,* "[W]hether UNLV's actions in compliance with the NCAA rules and recommendations turned the NCAA's conduct into state action." *Id.* at 193, 109 S.Ct. at 462. The Court answered "no," pointing out that UNLV retained the authority to withdraw from the NCAA and establish its own set of rules and enforcement procedures at any time.

■ The *Tarkanian* reasoning is applicable here. The fact that the State Defendants acted in compliance with the "rules and recommendations" of the Party Defendants does not turn the Party Defendants' conduct into state action. As stated in *Tarpley,* the plaintiff classes must allege that the Party Defendants "did more than simply make a recommendation to the state officials" that certain

individuals be hired to fill the temporary positions; they must claim that the Party Defendants "acted under color of state law by working in concert with the state officials to deprive" them of their constitutional rights. *Tarpley v. Jeffers,* 96 F.3d at 928 n. 3. Phone calls whereby the Party Defendants made suggestions as to the filling of temporary positions simply do not suffice to satisfy this standard, for it is noncontroverted that the Party Defendants had no actual hiring authority and did not make the actual employment decision.

■ Second, for applicant screening to meet the traditional government function test advanced by the plaintiff, a private party defendant would have to be responsible for the hiring of the public employee. As stated above, the plaintiff has neither so asserted nor provided any evidence to that effect. The hiring decisions remained in the hands of the State Defendants. This Court was able to find only a few cases where the Supreme Court had found private action to be a traditional government function in the context of a § 1983 case. *See West v. Atkins,* 487 U.S. 42, 56–57, 108 S.Ct. 2250, 2259–2260, 101 L.Ed.2d 40 (when State has delegated its constitutional duty to provide medical treatment to a physician with nonexclusive contract with the State, that physician is "acting under color of state law"); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (political organization's election machinery violated plaintiffs' Fifteenth Amendment right to vote on account of their race and color); *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (distribution of religious literature cannot be prohibited in company-owned town any more than it could be prohibited in any other municipality); *see also Georgia v. McCollum,* 505 U.S. 42, 51–55, 112 S.Ct. 2348, 2354–2357, 120 L.Ed.2d 33 (a criminal defendant's exercise of peremptory challenges constitutes state action for purposes of the Equal Protection Clause, reasoning, in part, that peremptory challenges perform a traditional function of the government); *cf. San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 545, 107 S.Ct. 2971, 2985, 97 L.Ed.2d 427 (United States Olympic Committee is not performing a governmental function because "[n]either the conduct nor the coordination of amateur sports has been a traditional governmental function"). The test for a finding of government action under this theory is whether the defendants have performed functions that have been "traditionally the *exclusive* prerogative" of the government. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 455, 42 L.Ed.2d 477 (emphasis added); *see also Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 2771–2772, 73 L.Ed.2d 418 (privately operated school for maladjusted high school students that gets students through referrals by city school committees under a state statute or by state agency is serving a "public function," but education of maladjusted students has not been *exclusively* the prerogative of the state, so its acts are not state action under Fourteenth Amendment). Advocating the hiring of an applicant for employment does not fall into a category of activities that are exclusively the government's, and this Court is persuaded by the Party Defendants' argument that imputing state action to the Party Defendants under the traditional government function analysis would require a similar finding with respect to any other person or entity advocating the hiring of a public employee. Such a result is untenable.

■ The district court was also correct in its conclusion that the Party Defendants were merely involved in expressing their opinion when they made recommendations with respect to the hiring of certain employees based on political considerations. As with other types of associations, the protection of freedom of speech and association is provided to the Party Defendants by the Constitution. *See N.A.A.C.P. v. Alabama ex rel. Patterson,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170–1171, 2 L.Ed.2d 1488. Just as the Constitution protects the right of the Party Defendants to advocate that a specific person be elected to a particular office (*see Colorado Republican Federal Campaign Committee v. Federal Election Commission,* —— U.S. ——, ——, 116 S.Ct. 2309, 2316, 135 L.Ed.2d 795; *Eu v. San Francisco County Democratic Central Committee,* 489 U.S. 214, 223–224, 109 S.Ct. 1013, 1020–1021, 103 L.Ed.2d 271;

*Buckley v. Valeo,* 424 U.S. 1, 48, 96 S.Ct. 612, 648–649, 46 L.Ed.2d 659), the Party Defendants are entitled to advocate the hiring of a specific person to perform a governmental function. Such recommendations are political expression for purposes of constitutional protection. An outcome to the contrary could have the effect of subjecting labor unions and other interest groups, legislators and influential private citizens to claims of unlawful conduct each time they advocated the hiring of a particular individual, even though these entities and individuals are clearly understood to be entitled to engage in political expression and association. *Rutan* is not to the contrary.[1]

### IV.

The State Defendants cross-appeal the district court's entry of a declaratory judgment on the pleadings in favor of the plaintiff to the effect that the "defendants' use of political affiliation as a criterion for hiring temporary highway maintainers [was] unconstitutional" under the *Rutan* decision. No. 93 C 4030, final judgment at 2. The State Defendants maintain that the Eleventh Amendment barred any relief against them because they were in complete compliance with the district court's rulings (*i.e.*, they were no longer considering political affiliation in filling the position of temporary highway maintainer) when they moved for judgment on the pleadings on October 4, 1994, and consequently there was no "ongoing" violation of federal law. The district court reasoned that the Eleventh Amendment did not bar such relief as long as the declaration did not operate as a money judgment against the State. *See Vickery v. Jones,* 878 F.Supp. at 1186.

▮▮▮ The district court's analysis of the history and purpose of the Eleventh Amend-

ment was entirely competent. By its terms, the Eleventh Amendment provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State.

The Eleventh Amendment operates to prohibit suits against states in federal courts, unless the state has consented in unequivocal terms or Congress unequivocally has expressed its intent to abrogate the immunity and does so through a valid exercise of power. *See Seminole Tribe v. Florida,* —— U.S. ——, —— – ——, 116 S.Ct. 1114, 1122–1123, 134 L.Ed.2d 252; *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842. In *Ex parte Young,* 209 U.S. 123, 159–160, 28 S.Ct. 441, 453–454, 52 L.Ed. 714, the Supreme Court created an exception to the general prohibition on suits by citizens against states, allowing a citizen to sue a state official when that official's action violates federal law. The State Defendants correctly point out that the *Young* exception permits relief against state officials only when there is an ongoing or threatened violation of federal law. *See Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1132; *Papasan v. Allain,* 478 U.S. 265, 277–278, 106 S.Ct. 2932, 2939–2940, 92 L.Ed.2d 209; *Green v. Mansour,* 474 U.S. at 71, 73, 106 S.Ct. at 427, 428; *Watkins v. Blinzinger,* 789 F.2d 474, 484 (7th Cir.1986), certiorari denied, 481 U.S. 1038, 107 S.Ct. 1976, 95 L.Ed.2d 816. Such requirement is intended to maintain the balance between allowing the "federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States,'" *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 105, 104 S.Ct.

---

1. The plaintiff also appears to ask us to explore extending the holding of *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708, to the facts of this case. In *Connick,* the Supreme Court held that, in any case alleging the violation of a public employee's free speech rights, the court must first address the issue whether the speech in question is of a public concern. *Id.* at 146, 103 S.Ct. at 1689–1690; *accord, Waters v. Churchill,* 511 U.S. 661, ——, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686. Plaintiff concedes that he has been unable to find any case that applies

the "public concern test" to a private person communicating with or regarding a public employee, nor were we able to do so. The "public concern test" is intended to balance between the competing interests of public employees' free speech rights, on one hand, and the State's interest, as an employer, in promoting the efficiency of the public services it performs through its employees, on the other hand. *Id.* at 142, 103 S.Ct. at 1687. Therefore, it would be wholly inappropriate to extend the *Connick* holding to the facts of this case.

900, 910, 79 L.Ed.2d 67 (quoting *Young,* 209 U.S. at 160, 28 S.Ct. at 454), and upsetting the delicate balance of federal and state interests that is at the heart of the Eleventh Amendment.

The State Defendants have argued that the present issue should be governed by *Watkins v. Blinzinger,* 789 F.2d 474, and *Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371, which addressed the requirement of an ongoing violation of federal law before a court may enter a declaratory judgment against a state official pursuant to *Young.* In *Watkins,* plaintiffs were AFDC recipients who challenged Indiana's method of calculating the period of AFDC ineligibility. By the time the case was heard in district court, Indiana officials had changed the offending method of calculation to one that satisfied the plaintiffs' concerns. Although this Court found that the case was not technically moot, *id.* at 483, we emphasized that "[w]hen the federal interest is no longer so pressing—when there is no continuing conduct that States must change to comply with federal law—the reason for the rule of *Young* no longer applies," *id.* at 484, so that the Eleventh Amendment barred an entry of a declaratory judgment.[2]

The plaintiffs in *Green v. Mansour* were also AFDC recipients who were challenging Michigan's method for determining a recipient's earned income, which in turn determined eligibility for and the amount of AFDC benefits, and sought declaratory relief. While the case was pending, Congress revised the applicable statute to require states to calculate the earned income in the same way that the plaintiffs had requested. Noting that plaintiffs were not at that time claiming that the State was violating federal law and that there was no threat of further violation, the Supreme Court held that a declaratory judgment would be inappropriate because its only purpose at that point would

be to resolve a dispute over the lawfulness of past acts, paving the way for a state court to determine the issue of damages or restitution, remedies otherwise prohibited by the Eleventh Amendment. 474 U.S. at 73, 106 S.Ct. at 428. The Court reasoned that such an " 'end run' " around the Eleventh Amendment was not permissible. *Id.*

The plaintiff in this case argues that the *Watkins* and *Green* cases are distinguishable from the case at hand. He points out that in *Watkins* the Indiana administrator in charge of public welfare had ordered that such new standard be used, and in *Green* the underlying law had changed in a way that made further violations of law impossible. The plaintiff contrasts the situation of the State Defendants in this case, where no public order or commitment has been given or issued to cease the consideration of political affiliation in temporary hiring. He argues, and the district court agreed, that, unlike the *Watkins* and *Green* cases, no such guarantee of compliance exists here.

The State Defendants claim that the district court ignored the requirement of a "continuing or impending" violation of federal law and focused only on the independent and additional requirement that any declaratory relief cannot operate as a money judgment for past violations against the State. *See, e.g., Papasan,* 478 U.S. at 278, 106 S.Ct. at 2940; *Green,* 474 U.S. at 106; *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355–1356, 39 L.Ed.2d 662. However, the district court did address this concern in its opinion. Although the court did, as the State Defendants point out, find it "unlikely" that the State Defendants would resume their prior practice, it noted that they had not clearly stated their intention to permanently cease using political affiliation as a criterion in hiring temporary workers. 878 F.Supp. at 1185. The court noted that, following its

---

**2.** In *Dial v. Coler,* 791 F.2d 78 (7th Cir.1986), certain Illinois officials charged with the implementation of the AFDC program in Illinois were sued regarding AFDC eligibility requirements. The federal laws in question had been changed by the time the case was heard by the court, although the parties argued over whether the state had permanently or temporarily changed its eligibility requirements. We held that although

it was an "extremely close case," the fact that "no retrospective or notice relief is available, ... a federal program has been changed; and ... new regulations have been promulgated thereunder" gave "reasonable assurance that the questioned conduct will not be resumed." *Id.* at 81. Therefore, we held that the claims of the plaintiffs were not ripe for review without reaching the Eleventh Amendment issue.

July 6 opinion holding that *Rutan* extended to protect temporary workers, the State Defendants risked losing their qualified immunity if they did not cease their prior hiring practices. *Id.* at 1186. The court concluded that:

> When a party, in response to an interlocutory order, refrains from engaging in the challenged practice, yet provides no assurance that the moratorium on implementing that practice is permanent, the federal interest in asserting authority to enforce federal law does not vanish. as a result. Therefore, the Court finds the likelihood that the defendants will reinstate the challenged hiring policy is sufficient to escape the Eleventh Amendment bar.

*Id.* While this is a close question, we decline to vacate the declaratory judgment against the State Defendants on the grounds they advance.

### V.

For the reasons discussed above, the decision of the district court is AFFIRMED.